UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPHINE FLUKER,

               Plaintiff,                             Civil Action No. 12-10612

      v.                                District Judge Arthur J. Tarnow
                                            Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]**

Plaintiff Josephine Fluker appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 10, 11). For the reasons set forth below, the Court finds that Plaintiff was denied a full and fair hearing. The Court also finds that the ALJ's decision is not supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 11) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Plaintiff was 42 years old on the date she alleges she became disabled. (Tr. 22.) Plaintiff has a high school education and has some vocational nursing training. (Tr. 387.) Plaintiff alleges that she is unable to work because of her depression, fibroid tumors, sarcoidosis, and diabetes. (*See* Tr. 34-35.)

### A. Procedural History

On January 18, 2007, Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") asserting that she became unable to work on July 2, 2006. (*Id.*) The Commissioner initially denied Plaintiff's disability application on July 20, 2007. (Tr. 132-33.) Plaintiff then requested an administrative hearing, and on July 21, 2010, she appeared with counsel before Administrative Law Judge James N. Gramenos, who considered her case *de novo*.[1] (Tr. 30-104.) In a January 25, 2011 decision, the ALJ found that Plaintiff was not disabled. (*See* Tr. 9-27.) The ALJ's decision became the final decision of the Commissioner on December 28, 2011, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) Plaintiff filed this suit on February 2, 2012. (Dkt. 1, Compl.)

---

[1] ALJ Gramenos conducted a prior hearing on February 11, 2009. (Tr. 105-31.) Following this hearing, on May 22, 2009, ALJ Gramenos issued a decision which concluded that Plaintiff was not disabled. (Tr. 134-47.) The Appeals Council vacated and remanded for the ALJ to: 1) evaluate Plaintiff's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 C.F.R. §§ 404.1529 and 416.929 and SSR 96-7p); 2) give further consideration to Plaintiff's maximum residual functional capacity ("RFC") during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (SSR 96-8p); 3) obtain evidence from a psychiatric medical expert, if available, to clarify the nature and severity of Plaintiff's impairments; 4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. (Tr. 150.)

2

**B. Medical Evidence**

Plaintiff has several mental and physical impairments, some arising from childhood.

In April 2006, Plaintiff went to Detroit Riverview Hospital complaining of shortness of breath; a chest x-ray, however, was normal. (Tr. 329.) In May 2006, Plaintiff had a mammogram, which was also normal. (Tr. 328.) An ultrasound of Plaintiff's pelvis, however, indicated at least two fibroids. (Tr. 330.) A pulmonary function test and CT scan in July 2006 were both normal. (Tr. 321-22.)

On August 3, 2006, a social worker at Detroit Central City, LaQuanda Williams, completed a Comprehensive Assessment. (Tr. 383-90.) Ms. Williams rated Plaintiff's marriage/relationship/family functioning as severely impaired, her job/school/performance as severely impaired, friendship/peer relationships as markedly impaired, hobbies/interests/play activities as markedly impaired, physical health as markedly impaired, activities of daily living (ADL's) as not impaired, eating habits as markedly impaired, sleeping habits (difficulty falling asleep) as severely impaired, ability to concentrate as markedly impaired, and ability to control her temper as mildly impaired. (Tr. 384-85.) Plaintiff's primary diagnosis was major depression as evidenced by "depressed moods nearly all day . . . with feelings of hopelessness, worthlessness, suicidal ideation with plan but no intent, 3 past suicide attempts, decreased energy and concentration with crying spells, anxiety and panic attacks." (Tr. 389.)

On August 4, 2006, nurse practitioner Susan Szczesny completed a psychiatric evaluation of Plaintiff. (Tr. 348-56.) Plaintiff reported experiencing panic attacks, constant crying, and thoughts of suicide. (Tr. 348.) Plaintiff also exhibited a diminished attention span, lowered concentration, decreased memory, paranoia and social isolation. (*Id*.) Plaintiff reported three or

four past suicide attempts and current suicidal thoughts, however, she posed no present suicidal threat.  (Tr. 352.)  Plaintiff reported that she only slept two hours per night and experienced nightmares.  (Tr. 353.)  Plaintiff also reported a poor appetite.  (*Id*.)  Plaintiff had impaired remote and recent memories; however, her immediate recall was intact.  (*Id*.)  Plaintiff had the ability to count five numbers in sequence forward; but only two numbers backwards.  (Tr. 354.)  She could make simple computations.  (*Id*.)  Plaintiff also had the ability to do abstract thinking exercises and explain similarities and differences between items.  (*Id*.)  In the opinion of Ms. Szczesny, Plaintiff's judgment was intact, but her insight was only "fair."  (Tr. 354-55.)  Plaintiff's decision-making was also "fair" and so was her impulse control.  (Tr. 355.)  Ms. Szczesny determined, however, that Plaintiff could handle her own funds.  (Tr. 356.)  Plaintiff's primary diagnosis was major depressive disorder.  (Tr. 355.)

Plaintiff attended therapy at Detroit Central City between 2007 and 2008, and psychiatric notes during that time chart her progress — which presented a fluctuating picture of Plaintiff's mental heath.  (Tr. 450-52, 453-54, 455-56, 457-73, 557-60.)  At times the progress notes indicated Plaintiff was making progress, but many of the progress notes, including some of the later ones, indicate that Plaintiff still reported hallucinations and psychotic features associated with her depression.  (Tr. 450-52, 453-54, 455-56,  457, 459, 461, 551-53.)  During this time, Plaintiff was prescribed medications for depression, anxiety, insomnia, psychosis, and racing thoughts.  (*Id*.)

On February 2, 2007, social worker Virdena Martin who had been working with Plaintiff for one-year completed a function report.  (Tr. 265-72.)  Ms. Martin observed that Plaintiff had difficulty with personal care due to her sarcoidosis, a lack of concentration, severe depression, and back problems.  (*Id*.)  Moreover, Ms. Martin observed that Plaintiff's pain and shortness of breath

4

affected her ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs. (Tr. 270.) Plaintiff

also exhibited difficulties following instructions and only had a three-minute attention span. (*Id*.)

She noted Plaintiff's inability to handle stress, severe anxiety, and crying spells. (*Id*.) Plaintiff also

demonstrated some unusual behaviors and fears including paranoia and visual hallucinations. (*Id*.)

On June 2, 2007, Atul Shah, M.D. conducted a psychiatric evaluation of Plaintiff. (Tr. 373-

76.) Dr. Shah noted a long history of depression stemming from early childhood abuse. (*Id*.) Dr.

Shah's primary diagnosis of Plaintiff was major depressive disorder, recurrent with psychotic

features in partial remission, and chronic panic disorder. (Tr. 375.) With respect to daily activities,

Plaintiff reported that she stayed in her room and did nothing, she watched television and drove only

when necessary. (Tr. 374.) She was able to take care of her daily chores and activities with some

rest and went shopping with family members. (*Id*.) Dr. Shah assigned Plaintiff a GAF score of 45.[2]

Dr. Shah also concluded that Plaintiff was not capable of managing her own benefits. (Tr. 376.)

On July 20, 2007, Dr. Rose Moten-Solomon completed a Mental Residual Functional

Capacity Assessment of Plaintiff. (Tr. 474-92.) Dr. Moten-Solomon concluded:

> The [Claimant] is a 43 year old female diagnosed with major
> depressive disorder with psychotic features. Recent MER from the
> treating source reports some progress. The [claimant] is sleeping
> better, cooperative, pleasant and living independently.    The

---

[2]   A GAF score is a subjective determination that represents "the clinician's judgment of the
individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical
Manual of Mental Disorders ("DSM–IV"),* 30–34 (4th ed., Text Revision 2000). It ranges from 100
(superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability
to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.*
at 32.

A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession
rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school
functioning (e.g. no friends, unable to keep a job)." *DSM–IV* at 34.

> [claimant's] ADLs are not markedly limited. She is capable of cooking complete meals, completing chores, managing finances and socializing. Hence, the [claimant] retains the mental capacity to engage in simple work activity.

(Tr. 477.)  Dr. Moten-Solomon concluded that Plaintiff had a medically determinable impairment of major depressive disorder recurrent with psychotic features; however, she indicated that it was in partial remission.  (Tr. 482.)  Dr. Moten-Solomon also concluded that Plaintiff was mildly restricted in her activities of daily living, and had mild difficulties in maintaining social functioning. (Tr. 489.)  She believed Plaintiff had moderate difficulties in maintaining concentration, persistence pace.  (*Id*.)  Dr. Moten-Solomon found that Plaintiff had no episodes of decompensation.  (*Id*.)

On February 17, 2008, Plaintiff was admitted to the emergency room with uterine bleeding secondary to fibroids.  (Tr. 519-20.)  Plaintiff was discharged two days later in stable condition. (*Id*.)  A transabdominal scan conducted on July 12, 2008, revealed an enlarged fibroid uterus.  (Tr. 519.)

On May 25, 2008, Dr. Philip Rahming completed a medical examination of Plaintiff.  He diagnosed Plaintiff with: 1) sarcoidosis, 2) fibroid tumors, 3) anemia, and 4) depression.  (Tr. 562-63.)  He limited Plaintiff to lifting less than 10 pounds no more than one-third of an eight hour day. (Tr. 563.)  Plaintiff could stand and/or walk less than two hours in an eight-hour work day, and sit less than six hours in an eight-hour work day.  (*Id*.)  He opined that Plaintiff could not use her hand/arms to reach or push/pull, or her feet/legs to operate foot/leg controls.  (*Id*.)  He indicated that Plaintiff's fibroids prevented her from such activities.  (*Id*.)  Dr. Rahming also concluded that Plaintiff was limited in sustained concentration and in her ability to interact with others.  (*Id*.)

On September 9, 2008, Dr. Yoon conducted a psychiatric evaluation of Plaintiff.  (Tr. 551-56.)  Plaintiff reported that she was "doing OK, the medicine is helping the way I think."  (Tr. 551.)

6

Moreover, Plaintiff reported: "I do not feel so anxious, and it slows down my thinking." (*Id.*)  The primary diagnosis was "major depressive disorder, recurr[ent], severe w[ith] psycho[sis]." (Tr. 555.) Plaintiff's GAF was 45.  (*Id.*)  Dr. Yoon concluded that Plaintiff had a positive response to therapy and medication.  (*Id.*)   Plaintiff was currently stable on existing medication, she was not suicidal, or homicidal.  (*Id.*)  Plaintiff had occasional random, intermittent, auditory hallucinations in a female voice.  The voice was not commanding, however, and Plaintiff was able to ignore it.  (*Id.*)  Plaintiff's sleep and appetite were within normal limits.  (*Id.*)

On April 12, 2010, Plaintiff was admitted to the ICU with a diagnosis of ketoacidosis.  (Tr. 567.)  Upon discharge, Plaintiff was also diagnosed with new onset diabetes mellitus Type 2, hypertension, dyslipidemia, depression, and a history of sarcoidosis.  (*Id.*)

On April 20, 2010, social worker Melanie Marion completed a Work Limitations Related to Psychiatric State form.  (Tr. 602-05.)  Plaintiff's primary diagnosis was major depression with severe psychosis.  (Tr. 602.)  Her GAF was 45.  (*Id.*)  Her depressive symptoms included: anhedonia of pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, difficulty concentrating or thinking, thoughts of suicide, hallucinations, and delusions or paranoid thinking. (*Id.*)  Ms. Marion concluded that Plaintiff had marked restrictions in her activities of daily living. (*Id.*)  Ms. Marion also concluded that Plaintiff had marked difficulty maintaining social functioning. (*Id.*)  Of the 20 categories of work limitations related to Plaintiff's psychiatric state, Ms. Marion concluded that Plaintiff was markedly impaired in 15 of those areas.  (Tr. 603-04.)  Plaintiff was moderately impaired in four areas, and was only not significantly impaired in her ability to use public transportation in unfamiliar places.  (Tr. 604.)

**C.  Testimony at the Hearing Before the ALJ**

       *1. Plaintiff's Testimony*

Plaintiff testified to having major depression, fibroid tumors, sarcoidosis, and diabetes — all of which she alleged prevented her from working.  (Tr. 34-35.)  She testified to receiving on-going treatment since 2006 for her depression.  (Tr. 35.)  Plaintiff testified to three or four "bad" days per week.  On these days she would not accomplish anything, including not bathing herself or getting dressed.  (*Id*.)  Plaintiff reported that she was still hearing voices, but that her medication was helping a little bit.  (Tr. 35-36.)  Plaintiff also reported experiencing ongoing panic attacks, usually three to four times per week.  (Tr. 36.)  She testified that she only slept three to four hours per night.  (*Id*.)  Plaintiff also reported excessive bleeding as a result of her fibroid tumors.  (Tr. 37.)  And, that her diabetes made her feel shaky and disoriented.  (Tr. 38-39.)

Plaintiff also testified to lower back pain.  (Tr. 39.)  She indicated that she would have difficulty bending, pushing or pulling with her upper torso, crawling, climbing, crouching, and kneeling.  (Tr. 39-40.)  Plaintiff reported that she would be able to lift eight pounds and could walk a block without any pain or discomfort.  (Tr. 40.)  She testified that she could sit for about 30 minutes and stand for 30 minutes.  (*Id*.)

Plaintiff testified that she had breathing problems as a result of her sarcoidosis.  (Tr. 40-41.)  She testified that she had problems breathing certain fumes and exposure to chemicals was difficult for her.  (Tr. 41.)  Plaintiff testified that her current medications make her feel sleepy and adversely affect her memory and concentration.  (Tr. 41-42.)

Plaintiff testified about caring for her three-year old grand-child, while the child's mother goes to work — although it is unclear from her testimony whether her son also helped with the care

8

during these times.  (Tr. 47.)  Plaintiff reported that she did her own laundry and that the laundry facilities were located in the basement of her apartment building.  (Tr. 50.)  Plaintiff also testified that she attended church on Sundays, and a Bible study class on Tuesdays – although, between the two meetings Plaintiff only attended four or five times per month because of her poor health.  (Tr. 52, 81.)  Plaintiff also indicated that she occssionally held a Bible study in her own home to prepare for the Bible study at church.  (Tr. 54.)  Plaintiff testified that she gets up during the church services if they get too long to stretch her legs and walk around.  (Tr. 58-59.)  Plaintiff also testified that she had difficulty comprehending the Bible and church literature.  (Tr. 82.)

Plaintiff testified that she was told that her back pain was the result of her fibroids.  (Tr. 60.) Plaintiff was taking Motrin 800 to relieve her symptoms, but her doctors advised surgery.  (*Id.*) Plaintiff testified that she was typically able to prepare her own meals, dress herself, and take care of her personal hygiene needs.  (Tr. 71-72.)  Plaintiff testified that she usually watched television from 1:30 p.m. until 5:00 p.m. everyday.  (Tr. 72.)  Plaintiff reported that she was able to do her own grocery shopping once per month.  (Tr. 75.)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") about job availability for a hypothetical individual of Plaintiff's age, education, and work experience with the following RFC:

> [a]n ability to occasionally lift and/or carry weights defined as up to one-third of the normal eight-hour work period, at least up to five pounds of weight.  Able to frequently lift and/or carry weights defined as up to two-thirds of the work period up to at least five pounds of weight. The issue of standing and/or walking, an ability to occasionally stand and/or walk, assuming normal breaks, for at least a period of up to two hours during a normal eight-hour work period. I went into the sitting position, assuming normal periods of breaks in the work setting, the hypothetical worker has the functional ability to engage in the sitting positions for periods of time, at least an overall

9

period of eight hours with performing work activities. The hypothetical worker requires a sit-stand option to be allowed alternating positions of sitting, standing and/or walking approximately every 30 minutes. The issue of environmental limitations, eliminate from consideration jobs that would have extremes of cold, heat, wetness or humidity. Eliminate from consideration jobs that have hazards in the work setting from unprotected areas of moving machinery, heights, ramps, ladders, scaffolding and on the ground level unprotected regions of holes and pits. This hypothetical individual can speak and understand the English language, able to effectively read print in the English language, effectively speak and understand the English language, and has the specific basic mental ability to understand, carry out and remember simple, unskilled work instructions. Has the mental functional ability to respond appropriately to supervision when performing unskilled work activity. Has the mental functional ability to respond appropriately to usual work situations and with co-workers when performing unskilled work activity. Has the mental functional abilities in dealing with changes in a routine work setting. The same hypothetical individual in dealing with the issues of stress has the mental functional capacity to engage in unskilled work activity that does not require exposure to high levels of stress. Now I define high levels of stress such as would be expected in occupations that require working in person with the general public, or an actual moving assembly line job and not a bench assembly type job.

(Tr. 84-86.)  The ALJ then asked the VE whether there were specific, unskilled jobs that would accommodate a reduced range of unskilled, sedentary occupations.  (Tr. 86.)  The VE responded that such positions would include bench assembler, hand packager, and visual inspector sorter.  (Tr. 87.)  The VE indicated that the only conflict with these positions and the Dictionary of Occupational Titles (DOT) is that the DOT does not address a sit-stand option.  (Tr. 88.)  However, the VE indicated that, based on his experience, he has observed such positions and placed people in such positions.  (*Id*.)

10

Plaintiff's attorney questioned the VE regarding a hypothetical individual of the same age, education and work background as Plaintiff with the following mental and functional capabilities and limitations: sit-stand option with a maximum of 30 minutes, occasional lifting of less than 10 pounds, no repetitive reaching, no pushing or pulling with the upper extremities, and no repetitive operating of foot or leg controls.  (Tr. 90-91.)  Plaintiff's attorney also included the following limitations: marked restrictions in daily living, marked difficulty in maintaining social functioning, marked ability to remember location and work-like procedures, marked ability to understand and remember short and simple instructions, marked ability to understand and remember detailed instructions, marked ability to maintain attention and concentration for extended periods, marked ability to perform activities within a schedule, maintain regular attendance, marked ability to sustain an ordinary routine without special supervision, marked ability to work in coordination with and proximity with others without being distracted by them, marked ability to make simple word constructions, marked ability to complete a normal work day and work week without interruption from psychological based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, marked ability to accept instructions and respond appropriately to criticism from supervisors, marked ability to respond appropriately to changes in the work setting, marked ability to be aware of normal hazards and take appropriate precautions, and marked ability to set realistic goals or make plans independently of others.  (Tr. 93-94.)  The VE indicated that such an individual would not have the ability to perform Plaintiff's prior work, or any other work in the national economy.  (Tr. 94.)

11

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Gramenos found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of July 2, 2006. (Tr. 14.) At step two, he found that Plaintiff had the following severe impairments: history of sarcoidosis, uterine fibroid tumors, type II diabetes mellitus, obesity, major depression, and anxiety. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 15.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, she can lift, carry, push and pull five pounds occasionally and frequently. She can sit for eight hours and stand and/or walk for two hours in a normal workday with a sit-stand option that allows her to change position every 30 minutes. She is precluded from work involving exposure to temperature extremes, wetness, or humidity. She cannot climb ladders, ropes, or scaffolds or work at unprotected heights. She cannot work around dangerous moving machinery or in an area with holes and/or pits. She is able to speak and understand English. She is able to effectively read and print English. She can understand, remember, and carry out simple unskilled work instructions. She can respond appropriately to supervision when performing unskilled work activity. She can respond appropriately to usual work situations and coworkers while performing unskilled work activity. She can deal with changes in a routine work setting. She can engage in unskilled work that does not include exposure to high levels of stress where high levels of stress means in person contact with the general public and moving assembly line work.

(Tr. 16.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 21.) At step five, the ALJ found that sufficient jobs existed in the national economy for

13

someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 22.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 23.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*,

14

499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

For the reasons stated below, this Court concludes that Plaintiff did not receive a full and fair hearing before an unbiased ALJ. In addition, the Court concludes that the ALJ's decision is not supported by substantial evidence.

### A.   Plaintiff Did Not Receive a Full and Fair Hearing Before an Unbiased ALJ

Plaintiff contends that the ALJ's questioning of her during the administrative hearing was "belligerent, inappropriate, and clearly adversarial." (Pl.'s Mot. Summ. J. at 18.) Plaintiff also contends that the ALJ's questioning was "bizarre and inappropriate often badgering Plaintiff regarding her activities." (*Id.*)

This Court has reviewed the motions, the administrative record, the Code of Federal Regulations, and the relevant case law and agrees that Plaintiff was denied her right to an unbiased administrative law judge under 20 C.F.R. §§ 404.940 and 416.1440. As a result, Plaintiff was denied a full and fair hearing under 20 C.F.R. § 404.927, and the Due Process Clause of the United States Constitution. Accordingly, this Court recommends that the case be remanded back to the Commissioner for a full and fair hearing before a different Administrative Law Judge.

15

ALJ Gramenos has been previously admonished by judges of this Court for failing to afford Social Security claimants a fair and impartial hearing, at least twice remanding cases to different ALJ's. *See Washington v. Comm'r of Soc. Sec.*, 1996 U.S. Dist. LEXIS 16233 (E.D. Mich. June 6, 1996) (Cook, J.); *Schenburn v. Comm'r of Soc. Sec*., 1996 WL 426534 (E.D. Mich. Jan. 31, 1996) (Zatkoff, J.). In *Washington*, Judge Cook remanded the case to a different ALJ because Judge Gramenos "showed what appear[ed] to be an overt skepticism and hostility to plaintiff's psychiatric condition." *Washington*, 1996 U.S. Dist. LEXIS 16233, at *12. There, the Court concluded that Judge Gramenos continually interrupted the plaintiff, was hostile toward her, and mischaracterized her testimony. *Id.* at *12-18. The Court ultimately concluded that the plaintiff did not receive a full and fair hearing on the degree to which her psychiatric impairments limited her ability to perform work on a full-time basis. *Id.* at *18. Judge Cook, therefore, remanded the case to a different ALJ to allow plaintiff's witnesses an opportunity to fully develop the factual record. *Id.*

The United States Supreme Court has recognized that claimants have a right to an unbiased ALJ:

> A fair trial in a fair tribunal is a basic requirement of due process. *In re Murichson*, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955). This applies to administrative agencies which adjudicate as well as to courts. *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S. Ct. 1689, 1698, 36 L. Ed. 2d 488 (1973). Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' *In re Murchison, supra*, 349 U.S. at 136, 75 S. Ct. at 625; *cf. Tumey v. Ohio*, 273 U.S. 510, 532, 47 S. Ct. 437, 444, 71 L. Ed. 749 (1927).

*Withrow v. Larkin*, 421 U.S. 35, 46, 95 S. Ct. 1456, 1465, 43 L. Ed. 2d 712 (1975). In addition, tribunals permitted by law to try cases must be unbiased and avoid all appearance of bias. *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 150, 89 S. Ct. 337, 340, 21 L. Ed.

16

2d 301 (1968).  Moreover, an ALJ is required to fully and fairly develop the record.  *Lashley v. Sec. of HHS*, 708 F.2d 1048 (6th Cir. 1983).  When a claimant is not given a full and fair trial, remand before a different ALJ is an appropriate remedy.  *See Ventura v. Shalala*, 55 F.3d 900, 903-05 (3d Cir. 1995) (ALJ's impatience, interrogations, and hostility towards a claimant's representative undermined a full and fair hearing).

This Court has carefully read the hearing transcript and agrees with Plaintiff that ALJ Gramenos' general demeanor during the administrative hearing was hostile — both toward Plaintiff and her representative.  Akin to what Judge Cook described in *Washington*, Judge Gramenos demonstrated an "overt skepticism and hostility" toward Plaintiff's psychiatric and physical impairments.  *See Washington*, 1996 U.S. Dist. at *12.  For example, when Plaintiff's attorney was eliciting testimony from Plaintiff regarding her fibroid tumors, the ALJ repeatedly interrupted and mischaracterized her testimony.  (Tr. 37-38.)  Specifically, Plaintiff's attorney tried to elicit testimony regarding Plaintiff's excessive bleeding due to her fibroid tumors (which is supported by the medical record in this case, *see e.g.,* Tr. 519, 521), however, ALJ Gramenos interrupted to demand that Plaintiff's attorney produce evidence of recent bleeding.  When Plaintiff's attorney indicated that she was unable to secure that recent evidence, ALJ Gramenos immediately directed Plaintiff's attorney to move to the issue of Plaintiff's diabetes, thereby preventing Plaintiff from fully developing the record regarding how her fibroids impacted her ability to work.  (Tr. 38.)

In another example, when ALJ Gramenos questioned Plaintiff about caring for her then three-year old grand-daughter, he specifically wanted to know if she took the child to a neighboring park.  (Tr. 48-49.)  He appeared belligerent when Plaintiff answered that she thought the name of the park was  the St. Ambrose Church parking lot and playground, quipping: "Well, you know it is."

(Tr. 48.)

Then asking Plaintiff about why her physical condition prevented her from working, the ALJ

again acted in a biased and hostile manner:

> Q. So, I'll phrase the question again, what is it about your physical condition that would not allow you to work, assuming there was no mental condition?
>
> A. My sarcoidosis, my back pain.
>
> Q. Did it occur to you in dealing with your friends, relatives, that a lot of people have back pain?
>
> A. Yes.
>
> Q. And they work?
>
> A. I guess.
>
> Q. Do you know people who have back pain and work?
>
> A. No.
>
> Q. You don't? Okay.

(Tr. 65.)

Another example, when questioning Plaintiff about her daily habits, ALJ Gramenos injected

racial undertones into the conversation — indicative of his bias against Plaintiff:

> Q. You'd awake at 1:30?
>
> A. Yes.
>
> Q. Watch TV? What kind of programs were you watching in the afternoon?
>
> A. Game shows.
>
> Q. Any other kind of shows up until 5:00?

18

A. No.

Q. Oprah is a very popular show in this nation and this community.

A. I don't look at it. I don't look at it.

Q. You don't watch Oprah?

A. Huh-uh.

(Tr. 68-69.)

ALJ Gramenos also seemed overly critical of Plaintiff's testimony regarding how her depression prevented her from keeping up with her daily hygiene:

A. Well, sometimes when I'm depressed, I don't bathe often like I should.

Q. Do you have a shower as well as a bathtub?

A. Yes, I do.

Q. And what is the problem that would keep you from maintaining a bathing cycle that would keep you reasonably clean?

A. I just be feeling down. I don't feel like getting up.  Just don't.

Q. But you're up.

A. Yeah.

Q. You've already established, you're up during the period of time.

A. I know. But I just don't feel like —

(Tr. 72.)

ALJ Gramenos also appeared hostile toward Plaintiff's counsel throughout the hearing, at times interrupting her and telling her that "you do talk fast," and another time "tell me when you're through, because I've tried from time to time thinking I was ready to talk . . . ."  (Tr. 97, 98.)  On

19

another occasion when Plaintiff's counsel was attempting to solicit information regarding Plaintiff's physical impairments, the ALJ again interrupted her and appeared disinclined toward allowing her to fully develop the administrative record:

> ALJ: What is it about her physical condition that you haven't covered today as to what she can and cannot do physically that needs additional attention through some record-keeping?
>
> ATTY: I just wanted documentation of the continued problems with her sarcoidosis that she did address so there's documentation in the file. As was requested—
>
> ALJ: The lady has testified — it's now 12:00. We started about 20 after 10:00. This is a very long hearing. It should not have been this long. But it has been. I've asked questions. I often wasn't getting any responses. I had to continue asking questions about the programs, gave her every opportunity to tell me what programs. I had to search out please, with the extent of this hearing in order to complete what it is this lady physically can and cannot do. That's been done. I don't know what you're going to accomplish by additional medical records. The claimant has testified as to what she can and cannot do physically. What is it you're going to add?
>
> ATTY: I just want it included, to detail the problems she's having —
>
> ALJ: Well, if you can get it, fine.
>
> ATTY: Correct.
>
> ALJ: If not, then you're not getting it.
>
> ATTY: Fine.

(Tr. 102-03.)

As in *Washington*, *supra*, the Court has concerns that Plaintiff did not have the ability to fully develop an administrative record regarding the degree to which her psychological and physical impairments limited her ability to perform work on a full-time basis. As such, it is recommended that the case be remanded for a further hearing before a different ALJ.

20

**B.      The ALJ's Decision is Not Supported by Substantial Evidence**

Separate and independent from the issue of bias, this Court also concludes that the ALJ's decision is not supported by substantial evidence.

Plaintiff first argues that controlling weight was not given to the objective medical evidence. (Pl.'s Mot. Summ. J. at 11-16.)  Plaintiff's primary argument is that the ALJ rejected the medical opinions of physicians Rahming, Shaw, and Yoon, as well as the opinions of nurse practitioner Szczesny and social workers Martin and Marion, in favor of a state agency medical consultant, Dr. Rose Moten-Solomon, who never examined Plaintiff, but only reviewed the case file.  (*Id.*)  Plaintiff also contends that the ALJ erred when he failed to follow the Appeals Council's remand order to obtain evidence from a psychiatric medical expert, if available, to clarify the nature and severity of Plaintiff's impairments.  (*Id.* at 13.)  Plaintiff also claims that not only does the ALJ's opinion mischaracterize Plaintiff's daily activities, the ALJ erred when he failed to properly evaluate the SSR 96-7p factors as directed by the Appeals Council's remand order. (*Id.* at 15.)  For the reasons below, this Court concludes that the ALJ did not meet his obligations under the Appeals Council's remand order.  Further, this Court agrees with Plaintiff that the ALJ's conclusion is not supported by substantial evidence.

In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine a claimant only once.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997).  Moreover, if a treating physicians's opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in the case, the opinion is entitled to controlling weight.  20 C.F.R. § 404.1527(c)(2)[3]; *see also Blakley v. Comm'r*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004).  If the ALJ does not give the opinion controlling weight, the ALJ must consider several factors when deciding what weight to accord the treating source's opinion, including but not limited to the length, nature, and extent of the treatment relationship and the frequency of the examination.  20 C.F.R. § 404.1527(c).  In addition, the ALJ must consider the medical specialty of the source, how well-supported the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(3)-(6).  The ALJ must also apply the factors in § 404.1527(c)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source.  20 C.F.R. § 404.1527(c).

The ALJ also discounted the opinions of Plaintiff's nurse practitioner (Susan Szczesny) and two social workers (Virdena Martin and Melanie Marion).  The opinions of nurse practitioners and social workers are considered "other sources" as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d).  These opinions "cannot by themselves, establish a medically determinable impairment, constitute a medical opinion, or be considered the opinions of a treating source."  (*Id.*)  Social Security Ruling 06-03p provides that the ALJ "generally should explain the weight given to the opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  *See also* 2006 WL 2329939, at *6 (Aug. 6, 2006).  The Sixth Circuit has stated: "[w]hile the ruling notes that

---

[3]  At the time of the ALJ's decision, the content of this Regulation was found under 20 § C.F.R. 404.1527(d).

information from 'other sources' cannot establish the existence of a medically determinable impairment, the information 'may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

Here, the ALJ discounted — in whole or in part — the medical opinions of three of Plaintiff's physcans: Dr. Rahming, Dr. Yoon, and Dr. Shaw.[4]

Dr. Rahming conducted a medical examination of Plaintiff on March 25, 2008, where he diagnosed Plaintiff with: 1) sarcoidosis, 2) fibroid tumors, 3) anemia, and 4) depression. (Tr. 562-63.) He limited Plaintiff to lifting less than 10 pounds no more than one-third of an eight hour day. (Tr. 563.) He opined that Plaintiff could stand and/or walk less than two hours in an eight-hour work day, and sit less than six hours in an eight-hour work day. (*Id*.) Plaintiff could not use her hand/arms to reach or push/pull, or her feet/legs to operate foot/leg controls. (*Id*.) Dr. Rahming indicated that Plaintiff's fibroids prevented her from such activities. (*Id*.) He also concluded that Plaintiff was limited in sustained concentration and in her ability to interact with others. (*Id*.)

The ALJ gave Dr. Rahming's opinions "little weight." (Tr. 20.) The ALJ noted that Dr. Rahming offered no objective evidence for the limitations he offered concerning sitting, standing, or walking. (*Id*.) Even considering her fibroid tumors, the ALJ opined that "there is no testing or

_____

[4] The ALJ refers to Dr. Rahming in his opinion as a "treating" physician, however, it is questionable on the record whether Dr. Rahming can be considered a treating physician as opposed to a non-treating, but examining source. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997 (6th Cir. 2011) (questioning in dicta whether a physician can be considered a "treating" source where he has only examined a patient three times over a four-month period). The Commissioner argues that the only record evidence directly tied to Dr. Rahming are treatment notes from March 25, 2008 – a one time evaluation of Plaintiff. This suggests that Dr. Rahming should be considered an examining source, as opposed to a treating source under *Helm*.

examinations that show limitations with range of motion, extension, or flexion that support a finding that claimant has any limitations in her upper or lower extremities." (*Id.*) Further, the ALJ discounted Dr. Rahming's opinions regarding Plaintiff's mental limitations because "he is a family doctor and does not have expertise dealing with psychological issues." (*Id.*) Moreover, "the reliability of his opinions is further eroded by the claimant's wide range of daily activities, including her ability to care for her granddaughter." (*Id.*)

On June 2, 2007, Dr. Atul Shah, M.D. conducted a psychiatric evaluation of Plaintiff. (Tr. 373-76.) Dr. Shah noted a long history of depression stemming from early childhood abuse. (*Id.*) Dr. Shah's primary diagnosis was major depressive disorder, recurrent with psychotic features in partial remission, and chronic panic disorder. (Tr. 375.) With respect to daily activities, Plaintiff reported that she stayed in her room and did nothing, she watched television and drove only when necessary. (Tr. 374.) She was able to take care of her daily chores and activities with some rest and went shopping with family members. (*Id.*) Plaintiff's GAF score was 45. Dr. Shah also concluded that Plaintiff was not capable of managing her own benefits. (Tr. 376.) The ALJ gave "little weight" to Dr. Shah's opinions because a GAF score is opinion evidence. (Tr. 19.) Further, the ALJ discounted Dr. Shah's opinions because Plaintiff lives independently, cares for her grand-daughter, and attends church regularly, which establishes that she functions at a much higher level. (*Id.*) The ALJ also noted that progress notes from Detroit Central City reveal that Plaintiff was making progress with medication and therapy. The ALJ concluded that this evidence as well as a review of the entire record, shows that the GAF is "arbitrarily low and not indicative of claimant's adaptive functioning." (*Id.*)

24

On September 9, 2008, Dr. Yoon conducted a psychiatric evaluation of Plaintiff. (Tr. 551-56.) Plaintiff reported that she was "doing OK, the medicine is helping the way I think." (Tr. 551.) Moreover, Plaintiff reported: "I do not feel so anxious, and it slows down my thinking." (*Id*.) The primary diagnosis was "major depressive disorder, recurr[ent], severe w[ith] psycho[sis]." (Tr. 555.) Plaintiff's GAF was 45. (*Id*.) Dr. Yoon concluded that Plaintiff had a positive response to therapy and medication. (*Id*.) Plaintiff was currently stable on existing medication, she was not suicidal or homicidal. (*Id*.) Plaintiff had occasional random, intermittent, auditory hallucinations in a female voice. (*Id*.) The voice was not commanding, however, and Plaintiff was able to ignore it. (Id.) Plaintiff's sleep and appetite were within normal limits. (*Id*.) The ALJ used this report to support his conclusion that Plaintiff was no longer anxious, that her sleep and appetite were within normal limits, and that Plaintiff had a positive response to medications. (*Id*.)

The ALJ discounted the opinion of nurse practitioner Susan Szczesny, who completed a psychiatric evaluation of Plaintiff on August 4, 2006. (Tr. 348-56.) In it, Plaintiff reported experiencing panic attacks, was constantly crying, and had thoughts of suicide. (Tr. 348.) Plaintiff also exhibited a diminished attention span, lowered concentration, decreased memory, paranoia and social isolation. (*Id*.) Plaintiff reported three or four past suicide attempts and current suicidal thoughts; however, she posed no present suicidal threat. (Tr. 352.) Plaintiff reported that she only slept two hours per night and experienced nightmares. (Tr. 353.) Plaintiff also reported a poor appetite. (*Id*.) Plaintiff had impaired remote and recent memories, however, her immediate recall was intact. (*Id*.) Plaintiff had the ability to count five numbers in sequence forward, but only two backwards. (Tr. 354.) She could make simple computations. (*Id*.) Plaintiff also had the ability to do abstract thinking exercises and explain similarities and differences between items. (*Id*.) In the

25

opinion of the Ms. Szczesny, Plaintiff's judgment was intact, but her insight was only "fair." (Tr. 354-55.) Plaintiff's decision-making was also "fair" and so was her impulse control. (Tr. 355.) Ms. Szczesny determined, however, that Plaintiff could handle her own funds. (Tr. 356.) Plaintiff's primary diagnosis was major depressive disorder. (Tr. 355.) The ALJ gave the GAF score little weight because Plaintiff lives independently, cares for her grand-daughter, and attends church regularly. (Tr. 19.) Further, the ALJ indicated that progress notes from Detroit Central City reveal that Plaintiff "consistently showed progress with medication and therapy." (*Id.*) The ALJ concluded that this evidence, as well as a review of the entire record, supported a determination that the GAF was arbitrarily low and not indicative of Plaintiff's adaptive functioning. (*Id.*)

In addition, the ALJ discounted the opinions of Plaintiff's social workers, Melanie Marion and Virdena Martin. (Tr. 20-21.) The ALJ gave Ms. Marion's opinions "little weight" because in his view they were "in sharp contrast to her progress notes in which she describes the claimant as making good progress on medication and therapy." (Tr. 21.) Additionally, her opinions were contradicted by Plaintiff's ability to live independently and care for her grand-daughter. (*Id.*) The ALJ also noted that social workers are not acceptable medical sources under the Regulations. (*Id.*) The ALJ gave Ms. Martin's opinions "little weight" because they were not, in his opinion, supported by the objective evidence or by Plaintiff's wide range of activities. (*Id.*)

Juxtaposed with this evidence, the ALJ gave "great weight" to the opinion of State agency consultant Dr. Rose Moten-Solomon. (Tr. 20.) The ALJ concluded that Dr. Moten-Solomon's opinions were "supported by the objective evidence, the treating notes from the mental health providers that show good progress, by the claimant's wide range of daily activities including caring for her grand-daughter, and because Dr. Moten-Solomon is an expert familiar with the meaning of

disability under the Regulations." (Tr. 20.)

This Court is troubled by several aspects of the ALJ's opinion and his selective treatment of the record evidence in this case. First, the Regulations provide that an ALJ should generally give "more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant.]" *See* 20 C.F.R. § 404.1527(d)(1). Here, the ALJ discounted every medical source opinion (Drs. Rahming, Shah and Yoon), as well as the opinion evidence of Plaintiff's nurse practitioner (Szczesny) and two social workers (Martin and Marion) in favor of a state agency psychiatrist who never personally examined Plaintiff. On the one hand you have six medical professionals all agreeing that Plaintiff has physical or psychological impairments that limit her ability to work on a full-time basis. Rose Moten-Solomon is the outlier.

The Court is also troubled by the fact that the Appeals Council, in its remand order, specifically instructed the ALJ: "obtain evidence from a psychiatric medical expert, if available, to clarify the nature and severity of the claimant's impairments." (Tr. 150.) It does not appear that the ALJ secured additional evidence in this regard. Plaintiff has a long and complex history of major depressive disorder with psychotic features. During the relevant time period, Plaintiff was given a GAF score of 45 by at least two independent medical evaluators (Drs. Shah and Yoon) – while not conclusive, these scores indicate serious impairment.

Third the Court notes that Dr. Moten-Solomon's opinion was offered early in the relevant time period (July 2007) and does not take into account what happened thereafter. *See e.g., Barnhorst v. Comm'r of Soc. Sec.,* 20011 U.S. Dist. LEXIS 96079 (S.D. Ohio Aug. 5, 2011) ("The ALJ's reliance on a single non-examining state agency report, to the exclusion of the later evidence entered into the record, highlights the ALJ's failure to account for the fluctuations in plaintiff's level

27

of functioning over time.").

The ALJ's reliance on Plaintiff's daily activities is also questionable. As stated above, Plaintiff was denied the ability to fully develop her testimony at the administrative hearing regarding how her physical and psychological limitations impacted her ability to work. Additionally, ALJ Gramenos placed a great deal of emphasis on the fact that Plaintiff babysat her grand-daughter and repeatedly used this fact to discount the opinion evidence of Drs. Rahming and Shah as well as nurse practitioner (Szczesny) and two social workers (Marion and Martin). However, this Court's review of the hearing transcript reveals that the ALJ never developed Plaintiff's testimony on this point. Indeed, Plaintiff never clarified whether she independently cared for her grand-daughter or if her son was helping with the child's care. Nor did she say what a typical day entailed.

Moreover, and importantly, according to 20 C.F.R. § 404.1545(b), to qualify for employment benefits a plaintiff must be able to engage in employment activities on a "regular and continuing basis." The activities of daily living described by ALJ Gramenos — cooking, cleaning, personal hygiene, attending church, watching TV and sewing — do not equate to being able to work on a "regular and continuing basis." *See* 20 C.F.R. § 404.1572(c) ("generally we do not consider activities, like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activities."); *Barnhorst*, 2011 U.S. Dist. LEXIS 96079, at *49 (*citing Kelley v. Callahan*, 133 F.3d 583, 389 (8th Cir. 1998) ("[A] person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity.")). The ALJ erred by relying on these activities in discounting the medical opinions and the opinions of the social workers and nurse practitioner.

28

Plaintiff also argues that the ALJ did not accurately portray Plaintiff's physical and mental impairments and nonexertional limitations in his residual functional capacity assessment. (Pl.'s Mot. Summ. J. at 16-19.)  This argument is premised almost completely on the ALJ's failure to adequately explain why the opinions of Drs. Rahming, Shah, Yoon, Szczesny, Martin, and Marion were rejected.  Therefore, this claim of error is moot in view of the Court's analysis above.

Finally, Plaintiff argues that the vocational expert testimony does not comply with social security rules and regulations.  (Pl.'s Mot. Summ. J. at 20.)  The ALJ based his hypothetical questions on a RFC that this Court has determined is not based on substantial evidence.  Therefore, this claim of error is moot in view of the Court's analysis above.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ did not afford Plaintiff a full and fair hearing.  This Court also finds that the ALJ's decision is not supported by substantial evidence.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that the Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the case be REMANDED to the Commissioner for further proceedings consistent with this opinion.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections,

29

but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: February 11, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 11, 2013.

s/Barbara M. Radke
Deputy Clerk

30